IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

INTERNATIONAL UNION OF OPERATING )
ENGINEERS, LOCAL 150, AFL-CIO, )
                                                  )
                 Plaintiff, )
                                                  )
                 v. )           Case No. 15 C 7104
                                                  )
C3 CONSTRUCTION SERVICES, INC., )
                                                  )
                 Defendant. )

## MEMORANDUM OPINION AND ORDER

International Union of Operating Engineers, Local 150, AFL-CIO (the "Union") brought this case to enforce an arbitration award against C3 Construction Services, Inc. ("C3").[1] Central to their current dispute is whether the designated arbitrator had the authority to decide the issue of arbitrability notwithstanding C3's denial that it had agreed to comply with the CBA at all, an issue that both sides suggested could be capable of resolution as a matter of law (Oct. 21, 2015 Tr. [Dkt. No. 13] 3:9-4:2). Because that is indeed the case, this Court has been able to determine that question just as though the litigants had filed cross-motions at a pretrial conference (see Fed. R. Civ. P. ("Rule") 16(c)(2)(K)).

---

[1] This opinion cites to the parties' memoranda as "Mem. --," with identifying prefixes of "U." for the Union and "C." for C3. For convenience, four documents referred to later in the text are also cited in abbreviated form throughout this opinion: Provisions of the Master Term Agreement are cited as "Master Agreement § --," those of the City of Chicago Multi-Project Labor Agreement are cited as "Multi-Project Agreement § --" (but where another document abbreviates that document to "PLA," this opinion adheres to that shorthand version) and those of the Collective Bargaining Agreement are cited as "CBA Art. --, § --," while the Arbitration Award is cited as "Award --."

## Standard of Review for Arbitration Awards

As United Food & Commercial Workers, Local 1546 v. Ill.-Am. Water Co., 569 F.3d 750, 754 (7th Cir. 2009) teaches, "[w]hen parties seek judicial review of an arbitration award, the role of the courts, both district and appellate, is extremely limited." Such awards must be enforced if (1) the dispute was submitted to the arbitrator either under a binding arbitration clause or through a failure to object (AGCO Corp. v. Anglin, 216 F.3d 589, 593 (7th Cir. 2000)) and (2) the arbitrator's subsequent decision "draws its essence from the contract" (United Food, 569 F.3d at 754).

Because "'a party cannot be required to submit to arbitration any dispute which he has not agreed to arbitrate,'" questions whether the parties have actually agreed to commit a dispute to arbitration are resolved according to ordinary contract principles (Grundstad v. Ritt, 106 F.3d 201, 204 (7th Cir. 1996), quoting the reconfirmation in AT&T Techs., Inc. v. Commc'ns Workers of Am., 475 U.S. 643, 648 (1986) of language originating in United Steelworkers v. Warrior & Gulf Nav. Co., 363 U.S. 574, 582 (1960)). Usually resolution of that question lies with the courts (Air Line Pilots Ass'n Int'l v. Midwest Express Airlines, Inc., 279 F.3d 553, 555 (7th Cir. 2002)) "[u]nless the parties clearly and unmistakably provide otherwise" (AT&T Techs., 475 U.S. at 649). And in all events the question whether the parties entrusted the arbitrator with the authority to decide arbitrability must remain for the court to determine (Air Line Pilots, 279 F.3d at 555).

As to charges that the arbitrator's decision did not "draw[ ] its essence from the contract," that standard does not authorize an inquiry into the merits of the award (Ethyl Corp. v. United Steelworkers of Am., AFL-CIO-CLC, 768 F.2d 180, 184-85 (7th Cir. 1985)). Instead arbitration

awards draw their essence from the contract whenever the arbitrator's decision "is based on the arbitrator's interpretation of the agreement, correct or incorrect though that interpretation may be" (United Food, 569 F.3d at 754). Hence, as United Food, id. went on to say:

> Thus, once we conclude that the arbitrator did in fact interpret the contract, our review is concluded.

## **Background**

When the City of Chicago (the "City") wishes to demolish a building, it solicits task order bids from prequalified demolition contractors. As part of the prequalification process the contractors sign the City of Chicago Master Term Agreement for Demolition Services ("Master Agreement"). Master Agreement § 10 reproduces the City of Chicago Multi-Project Labor Agreement ("Multi-Project Agreement") in full, while Master Agreement § 2.57 specifies:

> For construction, demolition, rehabilitation, maintenance, and/or renovation of real property, provided the total project value exceeds $25,000, the City of Chicago Multi-Project Labor Agreement is applicable. . . . Contractor acknowledges familiarity with the requirements of the PLA and its applicability to any Work under this Agreement, and shall comply in all respects with the PLA.

And the Multi-Project Agreement in turn incorporates a number of area-wide collective bargaining agreements, requiring that those agreements be made a part of all contracts entered into by the City when "the total Project value exceeds $25,000" (Multi-Project Agreement § 1).

C3 accepted the Master Agreement by signing Contract (PO) No. 26182, which prequalified it to submit task order bids and to be paid up to $3 million for demolition services from February 1, 2012 through January 31, 2015 (Complaint Ex. A). One of the Multi-Project Agreement signatory unions listed in the Master Agreement was the Union (Master Agreement § 10.1).

On May 17, 2013 the Union sent C3 a demand for arbitration pursuant to the Heavy and Highway and Underground Agreement Between the Mid-America Regional Bargaining Association (MARBA) and International Union of Operating Engineers, Local 150, AFL-CIO ("Collective Bargaining Agreement" -- hereafter simply "CBA"). While C3 had been paid just under a half million dollars under the Master Agreement by August 2013, it responded that it was not bound by the CBA (or its arbitration clause) because no single demolition task was worth more than $25,000. It maintained that each task order bid it won gave rise to a separate contract and constituted a distinct "project."

That dispute was heard by Arbitrator Edwin H. Benn, who issued an opinion and award ("Arbitration Award") in the Union's favor on April 15, 2014. Arbitrator Benn held that the CBA formed a part of the Master Agreement that C3 had signed because it had been incorporated into the Multi-Project Agreement, which had itself been made a part of the Master Agreement (Award 5, 12).[2] He further held that the Multi-Project Agreement (and through it the CBA) applied to C3 because all of the work it performed under the Master Agreement constituted a single "project" (Award 13-22).

When C3 refused to comply with the Arbitration Award, the Union filed this enforcement action on August 13, 2015. Because both sides agreed at the initial status hearing that the central issue in their case might be decided as a matter of law (Oct. 21, 2015 Tr. 3:9-4:2) -- albeit with the reservation that some kind of (unspecified) factual dispute might require resolution before the

---

[2] C3 has not argued that Arbitrator Benn was wrong to conclude that the CBA was incorporated into the Multi-Project Agreement as the "'applicable area-wide collective bargaining agreement' for demolition work for Local 150" (Award 5-6 n.16, quoting Multi-Project Agreement § 1) (ellipses omitted)).

- 4 -

case was disposed of entirely (id. at 8:10-13) -- this Court requested that the parties submit authorities supporting their respective positions (Dkt. No. 12). And once those were received this Court further requested that they submit memoranda addressing the scope of Arbitrator Benn's authority (Dkt. No. 16).

## Scope of Arbitrator's Authority

In its memorandum C3 urges that Arbitrator Benn's authority stemmed solely from the CBA. It takes a quantum leap from that premise to the conclusion that he thus exceeded his authority by interpreting the Master Agreement, so that his decision did not "draw its essence" from the CBA (C. Mem. 3). And C3 takes another leap by arguing that because it did not sign the CBA it never agreed to submit the dispute for arbitration in the first place (C. Mem. 4).

But both of those contentions collapse of their own weight (perhaps more precisely, they have no weight at all) because C3 did sign the Master Agreement, which incorporates the CBA that in turn incorporates the Multi-Project Agreement (Master Agreement § 10; Multi-Project Agreement § 1). So while this Court (like Arbitrator Benn and the parties themselves) speaks of three contracts for the sake of convenience and clarity, all of the provisions of the Multi-Project Agreement and CBA are in legal terms -- and in reality -- provisions of the Master Agreement.

What is at issue then is not at all whether C3 agreed to arbitrate according to the procedures outlined in the CBA. On the contrary, it was certainly the case that when C3 signed the Master Agreement, it agreed to submit to arbitration under the CBA all grievances arising from any project or projects whose total value exceeded $25,000 and that involved the Union. Thus it consented to arbitration under those near-plenary conditions.

Nor does this case turn on the question whether those conditions were satisfied. For while arbitrability is ordinarily for the courts to decide, parties can contract to submit that matter to arbitration as well (Air Line Pilots, 279 F.3d at 555). Hence the threshold issue for this Court is limited to the narrow question whether the CBA reserved the question of arbitrability for the arbitrator "clearly and unmistakably" as required by AT&T Techs., 475 U.S. at 649.

And on that score there is nothing unsettled for this Court to decide, for our Court of Appeals has already held in Air Line Pilots, 279 F.3d at 555-56 that substantially identical language in a collective bargaining agreement's arbitration clause does commit the question of arbitrability to the arbitrator. In the present action the CBA defines the grievances that must be submitted to arbitration (once other procedures have failed) to include "any claim or dispute involving an interpretation or application of the Agreement" (CBA Art. XIII, sec. 1). That language parallels the arbitration clause at issue in Air Line Pilots, which called for the arbitration of all disputes "growing out of grievances or out of interpretation or application of any of the terms of this Agreement" (279 F.3d at 555).

In light of that parallel, the ruling in Air Line Pilots, id. at 556 (citations omitted) might well have been written for this case:

> But when an arbitration clause is so broadly worded that it encompasses disputes over the scope or validity of the contract in which it is embedded, issues of the contract's scope or validity are for the arbitrators. . . . The arbitration clause in the collective bargaining agreement between Midwest and ALPA states that all issues concerning the interpretation and application of the agreement are for the arbitrators to decide, including therefore the applicability of the agreement to Moffatt's dispute with Midwest. Were this not the rule, the scope of arbitration would be unduly curtailed; for even when arbitration is the parties' chosen method of resolving contractual disputes, the position adopted by the district judge would require judges, not arbitrators, to resolve disputes over contractual provisions other than the arbitration clause itself.

In short, because that same determinative language is present in an identical context in the CBA (which it must be remembered was made a part of the Master Agreement), C3 clearly consented to have the arbitrator determine the scope of his authority.

That being so, C3 cannot now base its opposition to the Union's enforcement suit on the argument that Arbitrator Benn erred in determining whether the Master Agreement required that its dispute with the Union be submitted for arbitration under the CBA. And C3's untenable insistence that Arbitrator Benn did not draw the essence of his decision regarding arbitrability from the CBA because he looked to the Master Agreement is no more than a stalking horse for the contention that he erred in his arbitrability determination, for it is plain that Arbitrator Benn was properly addressing the question whether he had authority under the contract that by its terms gave him that authority.

As the analysis in this opinion has shown, that authority expressly encompasses "interpretation or application of the [CBA]," which in turn calls for interpretation or application of the term "project," whose scope defines the relationships among the Union, the City and C3. On that score it must be remembered that the Master Agreement was not specifically tailored for the City-Union relationship -- instead it is a sort of one-size-fits-all document.[3]

It can scarcely be gainsaid that what has just been said in the preceding paragraph and its footnote clearly torpedoes the totally artificial construct of the concept of a "Project" sought to be

---

[3] Importantly the Multi-Project Agreement (built into the Master Agreement by its verbatim repetition in Master Agreement § 10) couples the proviso "that the total Project value exceeds $25,000" (note the capitalization of "Project") with this language that follows immediately:

> In no event shall contracts be "split" so as to avoid the applicability of this Agreement.

advanced by C3.  And it necessarily follows both as an original matter and a fortiori that Arbitrator Benn's reading of that concept "draws its essence from the contract" without any need to be bolstered by this Court's own independent arrival at the same destination.

## **Conclusion**

Because the CBA assigns the question of arbitrability to the arbitrator and because that agreement was integrated into the Master Agreement that C3 signed with the City of Chicago, this Court rejects C3's lame effort to block enforcement of the Arbitration Award on the even less than specious ground that it was beyond the scope of the arbitrator's authority.  To discuss where this opinion leaves the case, a status hearing is set for March 21, 2016 at 8:45 am.

                                                                      Milton I. Shadur
                                                                      Senior United States District Judge

Date:  March 14, 2016